**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0352n.06

No. 10-2633

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 09, 2013*
DEBORAH S. HUNT, Clerk

ARTHUR BURGESS,

                Petitioner-Appellant,

v.

RAYMOND BOOKER,

                Respondent-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before:  MOORE and COLE, Circuit Judges; and ROSE, District Judge.[*]

**Rose, District Judge.**  Petitioner-Appellant Arthur Burgess appeals the denial of his petition for a writ of habeas corpus challenging his conviction for the murder of three individuals in Dearborn, Michigan.  Petitioner-Appellant asserts that the writ should issue because his constitutional rights under *Brady v. Maryland*, 451 U.S. 477 (1981) were violated, because his constitutional rights under *Strickland v. Washington*, 466 U.S. 688 (1984) were violated, and because his rights under *Evitts v. Lucey*, 469 U.S. 387 (1985) were violated.  The panel will **AFFIRM** the dismissal of the petition, as neither Petitioner's rights under *Brady v. Maryland*, 451 U.S. 83 (1967), nor those under *Strickand v. Washington*, 466 U.S. 668 (1984) and *Evitts v. Lucey*, 469 U.S. 387 (1985) were violated.

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

## I.    JURISDICTION

The district court exercised jurisdiction under 28 U.S.C. § 2254.  This Court has jurisdiction

over final orders pursuant to 28 U.S.C. § 1291 and additionally over issues certified under 28 U.S.C.

§ 2253(c).

## II.    STANDARD OF REVIEW

Section 2254(d) imposes the following standard of review in a habeas case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d).

A decision is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

decides a case differently than [the Supreme] Court has on a set of materially indistinguishable

facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable

application" of clearly established federal law "if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts

of the prisoner's case." *Id.*

### III.    FACTS AND PROCEDURE

Arthur Burgess was found guilty of the April 14, 1974 murders of his romantic rival and dishonest narcotic supplier Leslie Kinsman, as well as Kinsman's landlord, Victor Bossio, and Kinsman's bodyguard, James Ketelaar in Kinsman's apartment in Dearborn, Michigan. His conviction was supported by the testimony of two men: Scott Allan Croydon and Claude Johnson. Burgess now posits that another man present at the murder scene, Roman Poronczuk, committed the murder and that the testimony supporting his conviction was fabricated.

Kinsman lived with Mary, his wife of nine months, and their three-month-old son. Mary testified that on April 12, 1974 she heard someone enter the side door to the house, which led jointly to the two residences in the house, the Kinsmans' upstairs apartment and the landlord Bossio's abode in the basement. A few minutes after Mary heard the entrance, Bossio came up the stairs, knocked on the kitchen door, and stated that he wanted to see Leslie in the basement. Leslie Kinsman went to the basement alone.

Shortly thereafter Mary heard three shots from the basement. She started for the kitchen with Ketelaar, the bodyguard, ahead of her. She heard someone running up the stairs. Ketelaar stepped into the open door and shouted "what the hell is going on." Mary then heard another shot and saw Ketelaar fall backwards. Mary heard the outer door slam and a car start and speed away.

Mary yelled downstairs for Leslie with no response. When she walked down the stairs and into Victor Bossio's apartment she saw Bossio lying on the floor with his face covered with blood. She ran up the stairs and called Oakwood Hospital. She was told to call the police. Shortly thereafter, she called some friends who called the police. The police arrived within minutes.

3

Upon arrival, the Dearborn police officers discovered the bodies of Leslie Kinsman and Victor Bossio in the basement, and the body of Jim Ketelaar in the dining room. The officers preserved the scene for State Police Crime Lab experts. In their cursory review of the crime scene, they observed a house guest of the Kinsman's, Roman Poronczuk, who claimed to be showering during the shooting, had wet hair and the shower appeared to have been recently used. Poronczuk admitted that he took some heroin when he arrived at the house and said that he knew Leslie Kinsman was involved in drug trafficking.

A Michigan State Police technician determined that the trajectory of the single bullet fired upstairs passed through Ketelaar, which was consistent with Mary Kinsman's description of the events. The technician also testified that the blood stains found in the basement, the stairs leading from the basement, and the outside door knob were consistent with the blood types of Victor Bossio and Leslie Kinsman. The state police technical witness testified that bullet fragments found at the scene were consistent with having been fired from a .38 caliber pistol. The latent fingerprint expert testified that no fingerprints matching Burgess's were found at the scene.

Mary Kinsman testified that she first met Burgess in February 1972 in New Orleans. She stayed with him and his wife for five months before the trio moved to Las Vegas. During that same period of time and continuing for several months, Mary testified, she had sexual relations with Burgess, who was going to leave his wife for Mary.

In the fall of 1972, Mary met Leslie Kinsman and ended her affair with Burgess. The next time she had contact with him was at the funeral home after Leslie Kinsman was killed. She next saw Burgess at a restaurant in Ohio in the fall of 1974. She was staying in Ohio with her parents

when Burgess called her. He said he was no longer with his wife and wanted Mary to return to Detroit with him. Mary complied and further agreed when Burgess refused to allow her to mention Leslie's name during their conversation.

Two witnesses implicated Burgess in the Dearborn triple murders: Scott Allan Croydon and Claude Johnson. Croydon refused to testify, so the trial court allowed his preliminary examination testimony to be read to the jury. He said that he had first met Burgess around March 25, 1976, nearly two years after the Dearborn triple murder. Croydon testified that on several occasions, Burgess told him that Claude Johnson knew too much information about a triple murder that Burgess had committed in Dearborn in 1974 and that Johnson was spreading that information. Croydon testified that Burgess told him one of the people he killed was named Kinsman, and he killed him because Kinsman was "messing around with his old lady and crossed him up on some deals—business deals, dope deals." Burgess also told Croydon that he killed two other innocent people, one being the landlord. Croydon testified that "he had to take them out because they were witnesses." According to Croydon, Burgess explained that he shot and stabbed the people, then left in a car and later asked Claude Johnson to pick him up at another location to get rid of the guns.

Croydon also testified about Burgess's efforts to eliminate Claude Johnson. Croydon said that on April 12, 1976, Burgess's son, Gerald Hessel, and he went to Burgess's apartment in Roseville because Burgess planned to go to Johnson's house to kill him. At the apartment, Hessel called Claude Johnson, telling him that he and Croydon wanted to come over to buy some marijuana from Johnson.

5

Croydon said Burgess took a .45 caliber automatic pistol and gave Hessel and Croydon each a hunting knife, telling them that these were the knives he used during the Dearborn murders. The three drove to Johnson's house in two cars. Burgess gave Hessel the pistol and waited in one of the cars while Hessel and Croydon went to get Johnson. Hessel, Johnson, and Croydon went to Johnson's car, supposedly to purchase the marijuana. When they got to the car, Hessel pulled the gun and ordered Johnson to Burgess's car, threatening to rob Johnson. Johnson protested, saying that he would give Hessel and Croydon anything but that they did not have to rob him.

Johnson testified that he was forced into a car with Burgess and Hessel; Hessel drove, with Johnson and Burgess in the back seat. Croydon was ordered to follow them in the car, allowing him to observe some of the events that transpired. In the first car, Burgess questioned Johnson about being an informant, about money he owed him, and about a letter from the state police from his prison file. Burgess accused Johnson of being an informant and stated, "This ain't for nothing you've done. It's for what you could do." Johnson testified that he tried to escape as the car turned down a dead end street. Before he could leap from the car, however, Burgess and Hessel both stabbed him.

Johnson exited the car and ran approximately 50 feet, but he stopped because he was bleeding profusely. He said Burgess walked up to him, asked him if he wanted to go to the hospital, and then shot him repeatedly. Hessel and Croydon picked up Burgess some distance from Johnson's body. Burgess hesitated, stating "I got to turn back. Go see—go back and see if he is alive." By the time they returned to the scene, people were near Johnson, so the three men left the scene. Johnson survived, however, and Croydon, Hessel and Burgess were arrested on April 12, 1976, by a police

officer who later found two hunting knives in their cars, which were introduced into evidence. Burgess was prosecuted in a Macomb County court for the assault on Johnson.

Croydon testified that he had known Gerald Hessel for thirteen years, having grown up with him. Croydon stated that either Hessel or Brenda Burgess, Burgess's wife, were present during his conversation with Burgess about Johnson, during which Burgess showed Croydon portions of Claude Johnson's prisoner file and other documents that indicated Johnson had once cooperated with prison officials against another prisoner. Croydon remembered that Burgess said he used a .38 caliber pistol for the Dearborn murders.

Croydon testified at the preliminary examination that he was not promised any inducement by the Wayne County Prosecutor or the Dearborn police for his testimony. He acknowledged that the Macomb County prosecutor agreed to reduce a murder charge against him to armed robbery in exchange for testimony in the case against Burgess for assaulting Johnson.

Claude Johnson testified at Burgess's trial that he had known Burgess for 20 years as a friend. Johnson stated that a short time after the Dearborn murders, Johnson took Burgess to Saratoga Hospital after Burgess was involved in a motorcycle accident. At the hospital, Burgess told Johnson that he had stabbed and shot Leslie Kinsman, and killed the landlord and a man named Ketelaar. According to Johnson, Burgess said he shot Ketelaar because he was looking down the stairs after Burgess killed Kinsman and the landlord. Burgess explained that he initially went to the landlord's apartment in the basement and persuaded him to call Kinsman down. Johnson stated that the conversation was private, even though Mrs. Burgess went with them to the hospital. Johnson also

7

testified that Burgess had stated on several occasions that he did not like Leslie Kinsman, due to the fact that Kinsman married Burgess's girlfriend.

The defense called four witnesses: Brenda Burgess, Gerald Hessel, Ronnie Bankston, and William Cleary. Brenda Burgess testified that she had been married to Burgess for seven years, during which they had separated on several occasions. During one of their separations, Burgess lived with Mary Kinsman. Mrs. Burgess acknowledged that she saw a letter from the corrections department in July 1973 concerning Claude Johnson's cooperation with authorities. She said that her husband kept it in his jewelry box. She also testified that her husband had several knives and used them to clean fish.

Contrary to Croydon's testimony, Brenda Burgess insisted that Claude Johnson never had the opportunity to carry on a private conversation with Burgess at the hospital on the day of the motorcycle accident because she was with him at all times and Burgess was in too much pain to talk. She said she kept clippings of the Dearborn triple murder at their home, and at one time showed them to Scott Croydon. Mrs. Burgess stated that when she and Burgess went to see a concert with Gerald Hessel and Scott Croydon, that Burgess was always with her.

Hessel testified that he and Croydon visited Burgess together regularly in March and April of 1976. He said that he knew Croydon had been arrested and sent to a youth home on several occasions and had been convicted of attempted breaking and entering. Hessel testified that the Dearborn triple murder was never discussed when he was at Burgess's house with Croydon. But once, according to Hessell, Brenda Burgess gave Croydon a newspaper clipping about the Dearborn triple murder, when Burgess was not present.

8

Hessel testified that after he, Burgess, and Croydon were arrested in April 1976 for the assault of Johnson, Croydon brought up the Dearborn triple murder while they were in jail together. Hessel said Burgess once told him never to trust Johnson because he was an informant, and he showed him documents to verify that accusation.

Hessel also testified that on April 12, 1976, he, Croydon, and Burgess went to rob Johnson because he owed Burgess money; the Dearborn triple murder was never discussed. He stated that Burgess never said he used the hunting knives in the Dearborn triple murder. Hessel did acknowledge that Burgess told him after they were arrested and were with Croydon in the "bullpen" at the Macomb County jail that he believed Claude Johnson was trying to pin the Dearborn triple murder on him.

Hessel admitted that at one time he decided to try to testify against Burgess about the Dearborn triple murder in order to "extricate" himself from the Macomb County charges for assaulting Johnson, so he made statements to Dearborn police officers implicating Burgess. Hessel said he told Croydon about his intentions, and Croydon said they should both do that. Hessel said he and Croydon discussed this secretively since they did not want it "getting back to [Burgess]." State's Br. on Direct Appeal to Mich. Ct. App., at 15.

A man named Ronnie Bankston testified for the defense that in 1973 Burgess showed him a letter that indicated that Johnson was a State Police informant. Bankston said Burgess told him that if he did not "want any of my business known, don't say nothing around [Johnson]." *Ibid.*

Another man, William Cleary testified Burgess gave him a job as head maintenance man at a co-op apartment complex, where he once found two hunting knives and gave them to Burgess. He

identified the knives confiscated from Burgess at his arrest as those knives. He said he gave them to Burgess in the summer of 1974, before the Dearborn triple murder. Cleary also said that Burgess showed him a letter that related to Johnson in late 1973.

The jury found Burgess guilty of murder in the first-degree in the murder of Leslie Kinsman and guilty of second-degree murder of the other two victims. He was sentenced to three terms of life in prison.

In 1977, Burgess was convicted by a jury of one count of first-degree murder, Michigan Compiled Laws (M.C.L.) 750.316, and two counts of second-degree murder, M.C.L. § 750.317, in the deaths of Leslie Kinsman, Victor Bossio, and James Katelaar. Following his conviction and sentence, Burgess filed an appeal of right, through counsel, and raised the following six claims for relief, none of which substantially resembles the issues raised in the petition under review:

> I. Defendant was deprived of his right to a fair trial under the Due Process Clause of the 14th Amendment to the United States Constitution and under Section 17, Article 1, Michigan Constitution 1963 when the trial judge failed to exercise his discretion in denying defendant's motion for a protective order against cross-examination by the prosecutor of him concerning his past criminal convictions.
>
> II. Defendant was deprived of his right under the 6th Amendment to the United States Constitution and under Section 20, Article 1, Michigan Constitution 1963 to confront the witnesses against him and of his right under the Due Process Clause of the 14th Amendment to the United States Constitution and Article 1, Section 17, Michigan Constitution 1963 to a fair trial when the trial judge permitted the testimony of a prosecution witness given at preliminary examination to be read to the jury in lieu of his testifying at trial on the basis of his unavailability without the trial judge making a determination that the witness's claim of privilege against self-incrimination was supportable in fact and in law.
>
> III. Defendant was deprived of due process under the 14th Amendment to the United States Constitution and under Section 17, Article 1, Michigan Constitution 1963 when he was convicted of murder of the first degree under Count I of the information

10

when the record was devoid of any evidence to establish the necessary element of premeditation save defendant's extra-judicial 'confession' that he had planned the killing of deceased.

IV. Defendant was deprived of his right to due process and a fair trial under the 14th Amendment to the United States Constitution and under Section 17, Article 1, Michigan Constitution 1963 when the trial judge gave the jury an erroneous definition of malice and thereby removed that necessary element of the crimes charged from the jury's consideration.

V. Defendant was deprived of his right to a fair trial under the 14th Amendment to the United States Constitution when the trial judge erroneously cast the burden of proof upon him contrary to his right to have the prosecution prove beyond a reasonable doubt all elements of the crime charged.

VI. Defendant was deprived of his right to a fair trial under the Due Process Clause of the 14th Amendment of the United States Constitution when the trial court in instructions to the jury shifted the burden of casting question upon credibility of witnesses upon the defendant.

The Michigan Court of Appeals affirmed Burgess's convictions in a published opinion. (R. 10-19, Opinion; *People v. Burgess*, 96 Mich. App. 390 (1980)).

Burgess's appellate counsel filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims that were raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. (R. 10-21; *People v. Burgess*, Mich. Sup. Ct. No. 64971 (September 9, 1980)).

On December 18, 1981, Burgess filed a petition for writ of habeas corpus in the Eastern District of Michigan; however, that petition was dismissed without prejudice due to Burgess's failure to fully exhaust two claims contained in the petition. (R. 1, Petition, Appendix A (Opinion and Order Dismissing Petition for Writ of Habeas Corpus (July 9, 1982)).

11

Over twenty-one years later, in May 2003, Burgess filed a motion for relief from judgment in the state trial court, wherein he raised for the first time the issues presently before the Court.[1] Following a series of hearings, the motion was denied by the trial court based on the court's finding that the claims were procedurally defaulted and they were also meritless. (R. 10-18, Motion Hearing Tr. 12/2/05 (Part B), pp. 57-61; see also R 10-24, Order (Wayne County Cir. Ct. Jan. 17, 2006)).

After the state trial court denied the motion for relief from judgment, Burgess filed an application for leave to appeal in the Michigan Court of Appeals. The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Mich. Ct. R. 6.508(D). (R. 10-23, Order; *Michigan v. Burgess*, No. 268233 (Mich. Ct. App. Aug. 16, 2006).

Burgess then applied for leave to appeal this decision in the Michigan Supreme Court but was also denied relief under Mich. Ct. R. 6.508(D). (R. 10-25, Order; *People v. Burgess*, 477 Mich. 1055 (2007) (unpublished table decision).

On March 29, 2007, Burgess filed a second petition for a writ of habeas corpus in the Eastern District of Michigan wherein he raised the following claims for relief:

I. Petitioner was denied his right to a fair trial under the Due Process Clause of the United States Constitution (14th Amendment) and under Mich. Const. 1963, Art. I, Sec. 17, where the prosecutor failed to timely disclose critical *Brady* material.

II. Petitioner was denied the effective assistance of counsel guaranteed by the federal and state constitutions (U.S. Const., Amendment VI; Mich. Const., Art. 1, Sec. 20)

---

[1] The parties not having had the opportunity to brief the applicability of *Wood v. Milyard*, 132 S.Ct. 1826 (2012), the Court will not consider its discretion to enforce the one-year limitation on filing a petition challenging the merits of a conviction after it becomes final.

where his trial attorney, with no strategic purpose, made several outcome-determinative errors.

III. Petitioner was denied the effective assistance of counsel guaranteed by federal and state constitutions (U.S. Const., Amendment VI; Mich. Const. 1963, Art. 1, Sec. 20) where his appellate counsel, on direct appeal, neglected "dead bang winners."

IV. Assuming arguendo that the standard of review set forth in 28 U.S.C. § 2254(d)(1) precludes relief in this action, the Court should not apply the standard because it is unconstitutional, and the court should grant the writ under a de novo standard of review.

On November 17, 2010, United States District Court Judge David M. Lawson issued an opinion and order denying Burgess's request for habeas relief. *Burgess v. Bell*, No. 07-11367, 2010 WL 4790910 (E.D. Mich. 2010). The district court granted Burgess a certificate of appealability on his claim that the prosecutor committed misconduct when he failed to disclose potentially exculpatory evidence in violation of the law set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). (R. 17, Order Granting in Part and Denying in Part Certificate of Appealability). Upon Burgess's motion, this Court expanded the certificate of appealability to include two other claims for relief that Burgess raised in his habeas petition to the district court (effectiveness of trial and appellate counsel). (See Order dated November 23, 2011).

## IV.    ANALYSIS

### A.    *Brady* Claims

Petitioner-Appellant Arthur Burgess asserts that a variety of materials should have been provided pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). It was in *Brady*, that the Supreme Court held that a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution." *Id.* Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-434 490 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Supreme Court has further stated that: "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

To establish a *Brady* violation, a petitioner must make a three-part showing: (1) that the evidence in question is favorable, (2) that the state suppressed the relevant evidence, either purposefully or inadvertently, and (3) that the state's actions resulted in prejudice. *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2005); see also *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The disclosure obligation under *Brady* includes evidence that could be used to impeach the credibility of a witness. *Schledwitz v. United States*, 169 F.3d 1003, 1011-12 (6th Cir. 1999). However, there "is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from

14

another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Also, *Brady* does not apply to information "that is not wholly within the control of the prosecution," or "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information," or obviously, where the information is not exculpatory at all. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

In the instant case, Burgess has failed to establish (1) that any of his newly discovered evidence was exculpatory in nature, (2) that the prosecution actually suppressed the evidence, and (3) that any state action resulted in prejudice.

The first piece of evidence Burgess claims was improperly suppressed by the prosecution in violation of *Brady* is a supplementary police report from the Dearborn Police Department. (R. 1-2, Petition, Appendix A (Dearborn Supplementary Report)). The report was obtained through a Freedom of Information Act (FOIA) request in 2002. The information in this report was provided by an informant who conveyed the information to an FBI agent.

Burgess alleges that information in the report suggests that Mary Kinsman (Burgess's wife) and Roman Poronczuk were responsible for the triple murder. Poronczuk was in the house, taking a shower, at the time of the Dearborn triple murder. Burgess notes that the informant told authorities that Mary and Roman were romantically involved and used drugs together. Also, the informant stated that Mary had stolen $20,000 from her husband (Leslie Kinsman, one of the victims) and that Mary had waited until James Ketelaar died before she called the police on the night of the shootings. The report also details how Leslie Kinsman had recently been arrested on drug charges with a

"Mexican" while Kinsman attempted to purchase a pound of heroin from the Mexican. Kinsman was released, allowing one to speculate that he was acting as a government informant.

This, however, does not demonstrate a *Brady* violation with respect to this evidence because the record evidence before the federal district court suggests that Burgess possessed the alleged "newly discovered" evidence at the time of trial and, in fact, made use of it at trial. Testimony at trial indicates that both Mary Kinsman and Poronczuk had done drugs together on the night of the Dearborn triple murder. (R. 10-7, Tr. 10/14/77, p. 50-52).

Also within the report was a statement from an informant that Leslie Kinsman (the victim) was in the process of purchasing a pound of heroin from a Mexican on Vernor Highway when they were both arrested; Leslie Kinsman was later released. (R. 1-2, Petition, Appendix B (Dearborn Supplementary Report), p. 16). The report also contains information that a person named Frank Parker was involved with Leslie Kinsman in the drug business. (R. 1-2, Petition, Appendix B (Dearborn Supplementary Report), p. 16).

Burgess's counsel was aware of both Kinsman's drug deal with the Mexican, his arrest and release, as well as Kinsman's involvement of Frank Parker because these situations were discussed at trial. (R. 10-4, Tr. 10/11/77, pp. 90-91; R 10-5, Tr. 10/12/77, pp. 93, 111, 136-142, 144; R 10-6, Tr. 10/13/77, p. 10; see also R 10-23, State's Brief on Appeal to Mich. Ct. App. dated Feb 27, 2006, at 26-27 (citing R 10-4, Tr. 10/11/77, p. 87; R 10-5, Tr. 10/12/77, pp. 3, 20, 38, 88, 103, 105, 143).

Thus, if Burgess was not in possession of the report at the time of the trial, his counsel did possess the information contained therein, as he used information contained within it at trial.

16

Neither can Burgess demonstrate that he was actually prejudiced. First, the information contained in the supplementary report would likely not have been admissible at trial because the allegations came from an informant who spoke with an FBI agent. The FBI agent was the person who forwarded the information to local law enforcement. The statement from the informant consisted of inadmissible hearsay. The Supreme Court has held that there is no *Brady* violation where the evidence would have been inadmissible during trial. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995); see also *Henness v. Bagley*, 644 F.3d 308, 325 (6th Cir. 2011); *Jeffries v. Morgan*, 522 F.3d 640 (6th Cir. 2008).

And second, this case was, in effect, a credibility contest between prosecution witness Claude Johnson and the preliminary examination testimony of Scott Croydon on one side and the testimonies of Burgess's son, Gerald Hessel, and Burgess's wife, Brenda Burgess, on behalf of the defense. The information presented in the Dearborn supplementary report simply does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess had possession of the police report referenced in Appendices A and B attached to his habeas petition was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim will be affirmed.

Burgess also protests the failure to provide a police report by Detective Henry, who conducted a neighborhood canvass following the shootings. The report contains information on a statement made by Celia Rubay, a neighbor of Leslie and Mary Kinsman. (R. 1-3, Petition,

Appendix C (Supplemental Report of Detective Henry), p. 3). Burgess alleges that information provided by Celia Rubay suggests that the four people she saw in a vehicle near the time of the shootings may have had a connection to the crime. Celia Rubay told Officer Henry that she noticed a vehicle outside of window with four occupants in it. (R. 1-3, Petition, Appendix C (Supplemental Report of Detective Henry), p. 3). The driver attempted to park several times, but ended up driving away, apparently without any of the occupants exiting the vehicle. (R. 1-3, Petition, Appendix C (Supplemental Report of Detective Henry), p. 3).

Rubay's statement that a vehicle tried to park, but then drove away, does not have exculpatory value. (R. 16, Opinion and Order, p. 23). Moreover, the trial record demonstrates that Burgess's counsel had possession of the original canvass report, because Officer Harworth testified at trial and stated that Celia Rubay was someone that he had interviewed and the document was introduced as a trial exhibit. (R. 10-6, Tr. 10/13/77, pp. 19-25). This record evidence supports the trial court's finding that the evidence was not suppressed or that Burgess could have obtained it with reasonable diligence. Thus, the information presented in Detective Henry's supplemental report simply does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess had possession of the police report was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim will be affirmed.

Burgess next claims that the Dearborn supplementary report obtained through a FOIA request was improperly suppressed by the prosecution in violation of *Brady* for yet another reason. The report also contains information regarding Leslie Kinsman's alleged cooperation with federal law enforcement and information about an associate of Kinsman who was killed with a shotgun. (R. 1-2, Petition, Appendix B (Dearborn Supplementary Report), p. 12). Burgess contends that information about Leslie Kinsman's involvement with federal law enforcement and the fact that one of his alleged associates was killed with a shotgun suggests that Kinsman may have been killed as a result of his cooperation with law enforcement.

Burgess cannot demonstrate a *Brady* violation with respect to this evidence, however, because the record evidence before the federal district court suggests that Burgess possessed the alleged "newly discovered" supplemental report at the time of trial. Other information contained within the Dearborn supplementary report was actually used by Burgess's counsel at trial. As previously noted, Burgess's counsel was aware of other facts that were contained in the report. This information, regarding Kinsman's drug deal with the Mexican and Kinsman's association with Frank Parker, which was explored at trial, was found in the same report containing the information on Kinsman's cooperation with law enforcement. Thus, the record evidence supports the trial court's finding that the Dearborn supplementary report was not suppressed. Additionally, Kinsman's apparent cooperation with federal authorities and the death of one of his associates simply does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess had possession of this police report was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim should be affirmed.

Burgess also claims that the Dearborn supplementary report obtained through a FOIA request was improperly suppressed by the prosecution in violation of *Brady* for yet another reason. The report also contains information suggesting that Leslie Kinsman's landlord, Victor Bossio, was aware of Kinsman's drug business. (R. 1-2, Petition, Appendix B (Dearborn Supplementary Report), p. 18; R 1-3, Petition, Appendix B (Dearborn Supplementary Report), p. 19). Burgess asserts that information about Victor Bossio's knowledge of Kinsman's drug business suggests that Bossio himself may have been involved in that business, thereby suggesting that both Kinsman and Bossio were killed as a result of their drug dealing.

Burgess cannot demonstrate a *Brady* violation with respect to this evidence because, again, the record evidence before the federal district court suggests that Burgess possessed the alleged "newly discovered" supplemental report at the time of trial. As previously noted, other information contained within the Dearborn supplementary report was actually used by Burgess's counsel at trial. This information, regarding Kinsman's drug deal with the Mexican and Kinsman's association with Frank Parker, which was explored at trial, was found in the same report containing information that Victor Bossio knew of Kinsman's drug business. Thus, the record evidence supports the trial court's finding that the Dearborn supplementary report was not suppressed. Additionally, Bossio's potential

knowledge of his tenant's drug business simply does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court finding that Burgess had possession of the police report was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim should be affirmed.

Burgess claims that Scott Croydon's guilty plea and sentencing transcripts from his Macomb County conviction, as well as Croydon's 17-page statement to police regarding Burgess's involvement in the shooting of Claude Johnson and the murder of Theresa Martell were improperly suppressed by the prosecution in violation of *Brady*. Specifically, Burgess argues that transcripts from Macomb County contain information suggesting that Croydon's testimony against Burgess in Wayne County was "paid for" and that the content of the 17-page statement suggests that Croydon's testimony in Burgess's Wayne County preliminary examination on the Dearborn triple murder was recently fabricated.

Burgess fails, however, to demonstrate a *Brady* violation with respect to Croydon's guilty plea and sentencing transcript evidence because there is no evidence that the Wayne County prosecutor actually had the transcripts from Croydon's proceedings in Macomb County in his possession. Moreover, the transcripts at issue were public records that Burgess was able to obtain from a source other than the Wayne County prosecutor. This Court has previously made clear that "'records of public court proceedings, transcripts of [a government witness's] trial testimony, plea hearing, and sentencing hearing were available to [the defendant] from sources other than the

21

prosecution. *Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'" (R. 16, Opinion and Order, p. 25 (quoting *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003)(quoting *Coe*, 161 F.3d at 344)). For these reasons, *Brady* is inapplicable with respect to Croydon's plea and sentencing transcripts in Macomb County because the Wayne County prosecutor had no duty to obtain and provide copies of the transcripts to Burgess.

As regards the claims of inducement to testify, there is no evidence in the federal district court record to support Burgess's claim that Croydon was given an inducement by the Wayne County prosecutor to testify against Burgess in the Dearborn triple murder case. During the preliminary examination in Burgess's Wayne County case, Croydon testified that he was not offered a deal by the Wayne County prosecutor or the Dearborn police in exchange for his testimony. (R. 10-2, Prelim. Exam. Tr., pp. 118, 120-122). Burgess was aware that Croydon had pleaded guilty in Macomb County for his role in Burgess's attack on Claude Johnson and the murder of Theresa Martell because Croydon had already testified to the deal he received from Macomb County in Burgess's Macomb County trial on those offenses. (R. 16, Opinion and Order, pp. 25-26). There is no evidence to established that Croydon agreed to testify against Burgess in Wayne County pursuant to a plea agreement from the Wayne County prosecutor or the Dearborn police.

Thus, the record evidence supports the trial court's finding that the Scott Croydon's plea and sentencing transcripts from Macomb County were not suppressed. Additionally, because the Wayne County prosecutor did not give Croydon a deal in exchange for his testimony, Croydon's plea and sentencing transcripts from another county, regarding another crime, do not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess had possession of Scott Croydon's transcripts or could have obtained them with reasonable diligence is presumed correct and because the trial court's adjudication was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on the portion of Burgess's *Brady* claim relating to the Macomb County transcripts will be affirmed.

As regards Croydon's 17-page statement to the Macomb County Sheriff officers, Burgess was aware that Croydon made a statement to Macomb County officers at the time of trial, and he could have obtained the statement with reasonable diligence. During the preliminary examination in Burgess's Wayne County case, Croydon testified that he made a statement to Detective Savalox regarding the Macomb County case. (R. 10-2, Prelim. Exam. Tr., p. 121). Burgess was aware of Croydon's statement because Croydon testified in open court that he had made one. Thus, Burgess could have obtained that statement with reasonable diligence. Additionally, the district court correctly noted that the content of the statement is not as exculpatory as Burgess contends. (R. 16, Opinion and Order, p. 27).

Specifically, Burgess asserts that Croydon's testimony against Burgess was fabricated because the statement alludes to money being the motive for Burgess's attack on Johnson, rather than Johnson's knowledge of Burgess's role in the Dearborn triple murder. In the statement, Croydon posited that money was part of the motivation for Burgess's attack on Johnson, but Croydon also added that Burgess told him that he "wanted to kill Johnson because [] Johnson had a lot against him that could send him back to prison – if [] Johnson talked." (R. 1-3, Petition, Appendix G (Statement

23

of Scott Croydon, 3/1/77), pp. 3-6). Thus Croydon's statement did not univocally assert that money was Burgess's only motive to kill Johnson. (R. 16, Opinion and Order, p. 27). Thus, the evidence was not exculpatory as to Burgess's role in the Dearborn triple murder.

Finally, defense counsel used Croydon's 17-page statement in his cross-examination of Croydon during Burgess's Macomb County trial for his attack on Claude Johnson and his murder of Theresa Martell. (See R 10-23, State's Brief on Appeal to Mich. Ct. App. dated Feb 27, 2006, pp. 16-17).

The district court properly stated that Burgess did not dispute Assistant Prosecutor Puleo's assertion that he used Croydon's statement in Burgess's Macomb County trial in any of his state court pleadings, nor did he do so in the district court. (R. 16, Opinion and Order, p. 26). As the district court pointed out, if Burgess used the 17-page statement in the Macomb County trial, "it is difficult to see how he can contradict the state court's finding that the evidence was not suppressed in the Wayne County case." (R. 16, Opinion and Order, p. 26).

Thus, the record evidence supports the trial court's finding that Scott Croydon's 17-page statement to Macomb County officers was not suppressed and it was not exculpatory so as to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess both had possession of Scott Croydon's 17-page statement to police and, even if he did not, could have obtained it with reasonable diligence was not objectively unreasonable, Burgess is not

entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim will be affirmed.

Burgess also claims that Claude Johnson's statements to police regarding Burgess's involvement in his shooting were improperly suppressed by the prosecution in violation of *Brady*. Specifically, Burgess argues that Johnson's statements to police contain information suggesting that Johnson believed Burgess's motive in attacking him was because he was a "snitch" due to Johnson implicating another man in an arson crime, not because he knew about Burgess's role in the Dearborn triple murder, as Johnson testified at Burgess's Wayne County trial. (See R 1-3, Petition, Appendix F (Claude (Bob) Johnson Statements)).

Burgess cannot demonstrate a *Brady* violation with respect to this evidence because the record evidence, however, before the federal district court suggests that Burgess possessed these statements at the time of trial. Johnson's statements were taken in relation to Burgess's Macomb County prosecution for his attack on Johnson and his murder of Theresa Martell. A Wayne County Assistant Prosecutor stated in his response to Burgess's motion for relief from judgment that the officers who took Johnson's statements all testified at Burgess's Macomb County trial. As correctly noted by the district court, Burgess did not dispute that assertion in the state courts. (R. 16, Opinion and Order, p. 27). Further, Johnson testified at the Wayne County trial that Burgess considered him a "snitch." (R. 10-13, Tr. 10/20/77, pp. 15-18, 25-26, 64-65).

Thus, the record evidence supports the trial court's finding that the Johnson's statements to police in Macomb County were not suppressed. Burgess has failed to establish a *Brady* violation. Because the state trial court's finding that Burgess had possession of Johnson's statements to police

was not objectively unreasonable, Burgess is not entitled to habeas relief. Accordingly, the district court's denial of relief on this portion of Burgess's *Brady* claim will be affirmed.

**B.      Ineffective Assistance of Trial Counsel Claims**

Burgess asserts that his trial counsel was ineffective in three ways. First, by failing to elicit testimony from Burgess's wife, Brenda Burgess, which, Burgess asserts, would have established an alibi for him at the time the Dearborn triple murder occurred. Burgess's second asserted basis claims that trial counsel failed to investigate and present evidence regarding Mary Kinsman and Roman Poronczuk's motive to commit the Dearborn triple murder, or by extension, to better support the defense theory that the Dearborn triple murder happened as a result of victims' drug dealing. Finally, Burgess asserts that trial counsel failed to thoroughly cross-examine Scott Croydon during Burgess's preliminary examination.

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must establish that his counsel's performance was deficient and that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Regarding the performance prong, judicial scrutiny of counsel's performance must be "highly deferential" and a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.* at 688. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the

26

variety of circumstances faced by defense counsel or the range of legitimate decisions . . . ." *Id.* at 688-689 ("It is '[r]are' that constitutional competent representation will require 'any one technique or approach.'" *Pinholster*, 131 S. Ct. at 1407 (quoting *Richter*, 131 S. Ct. at 789)). The Supreme Court has said that there "are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Regarding the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Notably, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). In other words, "under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 131 S. Ct. at 788. In a habeas case such as this one, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As noted above, for purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. *Williams*, 529 U.S. at 410. The question is not whether a federal court believes the State court's determination under *Strickland* was incorrect but whether it was unreasonable—a substantially higher threshold. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (internal quotations omitted). On habeas review, a State court "must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 131 S. Ct. at 785. And "even a strong case for relief does not mean that the state court's contrary conclusion was

27

unreasonable." *Id.* at 786 (When § 2254(d) applies, the question is not whether counsel's actions were reasonable—the question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard. *Richter*, 131 S. Ct. at 788). Moreover, because the *Strickland* standard is a general standard, a State court "has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 129 S. Ct. at 1420; see also *Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

According to the Supreme Court, "[t]he standards created by *Strickland* and § 2254 are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788, quoting *Strickland*, 466 U.S. at 689; *Richter*, 131 S. Ct. at 788, quoting *Knowles*, 129 S. Ct. at 1413.

First, Burgess claims that his trial counsel was ineffective for failing to elicit alibi testimony from his then-wife, Brenda Burgess. Burgess fails to satisfy either prong of the *Strickland* analysis. Burgess cannot demonstrate that his counsel's performance was deficient. In 2003, Brenda Clavenna signed an affidavit wherein she attests that she remembers being with Burgess and another couple at a bar at the time the Dearborn triple murder occurred. (R. 1-3, Petition, Appendix D (Affidavit of Brenda Clavenna (Burgess), p. 1). Clavenna also asserted that she remembered that Burgess's trial counsel attempted to elicit testimony about her and Burgess's whereabouts on the night of the Dearborn triple murder, but objections by the prosecutor were accepted by the trial court. (R. 1-3, Petition, Appendix D (Affidavit of Brenda Clavenna (Burgess), p. 3). For this reason, Clavenna

never ended up testifying that Burgess had an alibi for the night of the Dearborn triple murder. Brenda also noted in her affidavit that defense counsel told her to contact the couple that she and Burgess were with that night, but the couple did not want to get involved. (R. 1-3, Petition, Appendix D (Affidavit of Brenda Clavenna (Burgess), p. 1).

As correctly noted by the district court, exculpatory affidavits made years after the events are "treated with a fair degree of skepticism," especially when there is "no reasonable explanation for the . . . delay." *Herrera v. Collins*, 506 U.S. 390, 423 (1993). Additionally, it is just as likely that trial counsel chose an alternate strategy instead of presenting an alibi defense that he could not otherwise support. (R. 16, Opinion and Order, p. 33). Further, the evidence presented in the affidavit is suspect because if it were true, Burgess would have gone to great lengths to present that claim on direct appeal. While Burgess claims that his appellate counsel was ineffective for failing to raise the claim on direct appeal, Burgess submitted a "Layman's Pleading" wherein he raised several claims that he argues his appellate counsel should have raised–yet, Burgess failed to raise a claim of ineffective assistance of counsel for failure to pursue an alibi defense. (R. 1-3, Petition, Appendix H (Layman's Pleading)). Thus, Burgess has failed to demonstrate that his trial counsel's performance was deficient with respect to the alibi testimony.

As to the prejudice prong, Burgess is unable to demonstrate the requisite prejudice in light of the evidence presented by both Claude Johnson and Scott Croydon, which implicated Burgess in the Dearborn triple murder. Because Burgess is unable to satisfy either prong of the *Strickland* analysis, the state trial court's determination that Burgess was not entitled to relief is not an

unreasonable application of Supreme Court law. Accordingly, this Court will affirm the district court's denial of relief.

As to Burgess's claim that his trial counsel was ineffective for failing to investigate and present evidence on Mary Kinsman and Roman Poronczuk's motives to kill the victims. Burgess fails to satisfy either prong of the *Strickland* analysis. Burgess argues that his counsel should have found the supplementary police report from the Dearborn Police Department, which, he asserts, would have suggested that Kinsman and Poronczuk had a motive for murder and that it was related to the victims' drug business. (R. 1-2, Petition, Appendices A-B (Dearborn Supplementary Report)). However, as previously noted, Burgess has not rebutted the presumption that his counsel actually possessed the Dearborn Supplementary Report. Further, defense counsel did, in fact, present questions to Mary Kinsman about her husband's fears in this regard just prior to his death. (R. 10-4, Tr. 10/11/77, pp. 90-92). Defense counsel also attempted to undercut Roman Poronczuk's testimony and cast him in a suspicious light when counsel got Poronczuk to admit that he took heroin when he arrived at Leslie Kinsman's house on the night of the Dearborn triple murder. (R. 16, Opinion and Order, p. 34).

Thus, the district court correctly determined that defense counsel did, in fact, present a defense that the victims' deaths were related to Kinsman's drug business and were not perpetrated by Burgess. (R. 16, Opinion and Order, p. 34). In light of the highly deferential *Strickland* standard, Burgess is unable to establish that his counsel's method was anything other than a reasonable trial strategy. Neither is Burgess able to demonstrate the requisite prejudice in light of the evidence presented by both Claude Johnson and Scott Croydon, which implicated Burgess in the triple murder.

Because Burgess is unable to satisfy either prong of the *Strickland* analysis, the state trial court's determination that Burgess was not entitled to relief is not an unreasonable application of Supreme Court law. Accordingly, this Court will affirm the district court's denial of relief.

Finally, Burgess claims that his trial counsel was ineffective for failing to thoroughly cross-examine Scott Croydon at the preliminary examination due to the fact that counsel was given insufficient time to prepare. Burgess claims that his counsel's inadequate preparation time qualified as a constructive absence of counsel at a critical stage, thereby resulting in a presumption of prejudice. See generally *United States v. Cronic*, 466 U.S. 648, 659-660 (1984).

Burgess's claims fails for two reasons. First, the law set forth in *Cronic* is inapplicable in this case because *Cronic* was decided after Burgess's conviction became final in 1980, the rule established in *Cronic* was prospective only, and neither of the exceptions applies here. (R. 16, Opinion and Order, p. 35-36 (citing *Teague v. Lane*, 489 U.S. 288 (1989); *Duncan v. United States*, 552 F.3d 442, 444 (6th Cir. 2009); see also *Lambrix v. Singletary*, 520 U.S. 518, 539 (1997)). Second, the circumstances presented here would not qualify as a structural error even if *Cronic* was applicable. Burgess claims that his counsel was appointed to represent him only a few days before the preliminary examination and did not have adequate time to prepare. However, as the district court correctly notes, the record indicates that defense counsel accepted the assignment, visited his client in jail, and represented him at the preliminary examination. (R. 16, Opinion and Order, p. 37). Burgess may believe that his counsel's performance could have been better if he had had more time, but such a situation does not qualify as a lawyer who "fails to subject the prosecution's case to meaningful adversarial testing." (R. 16, Opinion and Order, p. 37(quoting *Cronic*, 466 U.S. at

31

659)). Because *Cronic*'s presumed prejudice is inapplicable here, Burgess is required to demonstrate both prongs of the *Strickland* analysis in order to establish ineffective assistance of counsel. Burgess failed to argue the prejudice component in both the state courts as well as the federal district court. Accordingly, Burgess cannot meet his burden and this Court should affirm the district court's denial of relief.

## C. Application of Federal Law to Petitioner's Claim of Ineffective Assistance of Appellate Counsel

In his final claim, Burgess contends that he was denied the effective assistance of appellate counsel due to his counsel failing to raise the issues discussed above during his direct appeal. Burgess's claim must fail because he is unable to establish either prong of the *Strickland* analysis.

Burgess has failed to demonstrate that his appellate counsel's performance was deficient or that he was prejudiced by any error because, as the state court and the federal district court correctly held, the issues discussed above are without merit. *Jones v. Barnes*, 463 U.S. 745 (1983) (a criminal defendant lacks a constitutional right to have appellate counsel raise every non-frivolous issue on appeal). Appellate counsel therefore was not ineffective for failing to raise the issues on direct appeal because they would not have succeeded. (R. 24, Opinion, p. 22). Accordingly, Burgess is not entitled to relief on this claim.

## V. CONCLUSION

Because neither Burgess's rights under *Brady v. Maryland*, 451 U.S. 83 (1967), nor Burgess's rights under *Strickand v. Washington*, 466 U.S. 668 (1984) and *Evitts v. Lucey*, 469 U.S. 387 (1985) were violated., the judgment of the district court is **AFFIRMED.**

32

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I concur in the judgment affirming the judgment of the district court. Burgess has failed to show that the district court erred in denying him a writ of habeas corpus on any ground developed in his brief.