RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID L. ROBINSON,

        *Petitioner-Appellee,*

    *v.*

DAVID MILLS, Warden,

        *Respondent-Appellant.*

No. 09-5243

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 04-00067—William J. Haynes, Jr., District Judge.

Argued: October 8, 2009

Decided and Filed: January 28, 2010

Before: RYAN, COLE, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** John H. Bledsoe, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Henry A. Martin, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** John H. Bledsoe, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Henry A. Martin, Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

CLAY, Circuit Judge. Respondent, David Mills, Warden, appeals the district court's order granting Petitioner David Lee Robinson, Jr. a conditional writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court granted the writ based on a finding that the State, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), withheld impeachment evidence that would likely have altered the outcome of the case. For the reasons set forth

1

herein, we **AFFIRM** the district court's grant of the petition for a conditional writ of habeas corpus.

## I. BACKGROUND

### A.     Procedural History

On January 13, 1995, Robinson was indicted in Putnam County, Tennessee, along with Deloris Smith, for the first degree murder of Gerald Irwin. Robinson was convicted and received an automatic sentence of life imprisonment. The Tennessee Court of Criminal Appeals affirmed the conviction and the Tennessee Supreme Court denied Robinson's application for permission to appeal.

Robinson subsequently filed a timely petition for state post-conviction relief, alleging multiple claims of constitutional error. Specifically, Robinson claimed, *inter alia*, that the State failed to disclose its agents' second interview of James Rice, who provided an affidavit stating that (1) prior to Irwin's death, Irwin told Rice that he was going to kill someone if he did not receive his money that night; (2) Rice was present when Irwin called Robinson on the telephone and asked about money owed to him; and (3) Kim Sims, the State's star witness, was present when all such threats were made. Robinson also alleged that Sims was a paid state informant.

The trial court denied Robinson's petition, finding Rice's affidavit inadmissible because of his death, and further finding that even if admissible, the contrary testimony by the key agent on the case that only one taped interview was conducted was more credible. The parties failed to develop the allegation of Sims' status as a paid informant and the state courts did not address this issue. The Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief and the Tennessee Supreme Court denied Robinson's application for permission to appeal.

On August 16, 2004, Robinson filed a timely petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, seeking to set aside his first degree murder conviction and automatic life sentence. Following the appointment of counsel, he filed an amended petition for writ of habeas corpus. Among the claims set forth in Robinson's amended petition was the allegation that the State violated his rights under *Brady* by failing to disclose Sims' status

as a paid state informant.  In an order filed January 26, 2009, the district court granted Robinson a conditional writ of habeas corpus, permitting the State of Tennessee 120 days from the date of the order to retry him.  The State of Tennessee filed a timely notice of appeal and this Court stayed the district court's judgment pending appeal.

### B.     The Underlying Crime

The Tennessee Court of Criminal Appeals made the following factual findings:

> [Petitioner and Deloris Smith] were indicted for the first degree murder of Gerald L. Irwin in Putnam County.  During the evening of January 12, 1995 and early morning hours of January 13, the victim contacted . . . Robinson several times about the payment of a $200 debt that Robinson owed him.  Robinson met with the victim, a known drug dealer, on two occasions that night, but denied having the money to pay the debt.  Finally, Robinson called the victim and said that he had the money and expressed his desire to meet the victim.  The victim suggested that they meet at the "old oak tree" in Cookeville.
> Evidence showed that Robinson resold drugs that he obtained from the victim and, specifically, that he sold drugs to . . . Smith and had done so for approximately one year.  Smith was at the Robinson residence to purchase drugs on the night of January 12, 1995.  Although she did not know the details, Smith was aware that someone was trying to collect money from Robinson.  In conjunction with that, Smith had driven Robinson to a pay phone to make phone calls that evening.  She was also present at the Robinson home when the victim called and suggested the meeting at the oak tree.  Smith agreed to take Robinson there.
> Smith drove Robinson to the old oak tree and they waited for the victim to arrive.  Robinson was in possession of a small handgun that Smith had provided.[1]  As the victim approached, Robinson exited the vehicle and told Smith to drive around and then come back and get him.  Robinson got into the backseat of the victim's car.  Kim Sims was a passenger in the front seat.  The victim drove a short distance and pulled into a parking lot to turn around.  As the victim turned his car, Robinson shot him in the back of the head.  Robinson then told Kim Sims to move to the backseat.  Robinson got in the driver's seat and pushed the victim's body over so that he could drive the car.  As Robinson drove the victim's vehicle past Smith's vehicle, he motioned for her to follow him.
>
> _____
>
> [1]In her statement to the police, Smith said that she had given Robinson the gun earlier that evening when he made the statement, "I need a gun."
>
> They drove on Interstate 40 to the Smithville exit where Robinson pulled off and parked the victim's car on Tucker Ridge Road.  He took the victim's wallet, cellular phone, pager, money, and some drugs.  He and Sims

got into the Smith vehicle and they returned to Cookeville. Robinson, Smith, and Sims concocted a "story" regarding their activities that evening. The day following the shooting, Robinson called the victim's friends and family inquiring about his whereabouts, apparently in an attempt to divert any suspicion.

According to Sims' testimony, she spent part of the day pretending to be looking for the victim and asking others about his whereabouts, likewise in an effort to divert suspicion from her. Both Sims and Smith gave statements to law enforcement officials that corroborated the concocted story. Those statements were later recanted and both gave new statements to law enforcement officials.

Robinson testified at the trial and denied having any intent to kill the victim. He claimed that he shot the victim in self-defense. Robinson said that the victim had threatened him and his family over the course of the night and he shot the victim because the victim pointed a gun at him while in the car.[2] Although she did supply the gun, Robinson stated that Smith had nothing to do with the murder and did not know anything about it. The State theorized, however, that Robinson and Smith planned the murder and both were involved. *Although certain details were corroborated by a number of other witnesses, the State's theory was established principally by Kim Sims, the only eyewitness to the crime. Sims testified that she did not see the victim reach for his gun, and although she had been with the victim several hours that night, she never heard him threaten Robinson.*

Smith did not testify at trial, but her second statement to law enforcement officials corroborated Robinson's testimony that he was fearful of the victim. In her statement, Smith denied any involvement in the murder, but admitted giving the weapon to Robinson.

_____

[2]Undisputed proof established that the victim was armed with a .357 Magnum which was visible in the front seat of his car.

*State v. Robinson*, No. 01C01-9609-CR-00412, 1999 WL 61062, at *1-2 (Tenn. Crim. App. Feb. 10, 1999) (emphasis added). No physical evidence or testimony, except Sims', contradicted Robinson's assertion that he shot Irwin in self-defense.

## C.     Sims' Work as a Confidential Informant

Prior to trial, Kim Sims worked for the Sparta Police Department as a paid confidential informant ("CI"). On February 17, 1995, about a month after Irwin was shot, Sims was an informant against Irwin's sister and was paid $70 for her cooperation. Irwin's sister, Debra Irwin, later served as a witness at Robinson's trial. Sims worked as a CI for the Sparta Police Department on at least seven other occasions and was paid each time. Sims also worked as a CI for the Putnam County Sheriff's Office ("PCSO") and the Tennessee

Bureau of Investigation ("TBI"), both of which spearheaded the investigation in the Robinson/Irwin case. On January 25, 1996—eighteen days before Robinson's trial commenced—Sims aided a Putnam County detective and a TBI agent in making a controlled buy from Wade McClure, who also later served as a witness at Robinson's trial. The district attorney appointed a special prosecutor from another district because of Robinson and Delores Smith's ties to local law enforcement.[1] Nonetheless, Robinson's lawyers were not informed of Sims' activity as a CI or that Sims had informed against two of the State's witnesses—Debra Irwin and Wade McClure.

###    D.    Sims' Trial Testimony

When Sims testified at a preliminary hearing a year before trial, she stated that she did not see what happened at the critical moment when Robinson shot Irwin and had no idea whether Irwin reached for his gun. Sims also stated that Robinson "just stared at [her]" after shooting Irwin and said that he had to kill Irwin or Irwin would have killed him.

Sims' trial testimony, however, differed significantly from her testimony at the preliminary hearing. At trial, Sims stated that when Irwin turned into the parking lot, he did so slowly and with a pork chop sandwich in his right hand, thus making it unlikely that Irwin grabbed his gun with his right hand. She also stated that after shooting Irwin, Robinson was "smiling," which paints Robinson as cold and calculating and contradicts his assertion that shooting Irwin was self-defense rather than premeditation. Robinson's lawyers attempted to impeach Sims at trial, questioning her about her drug addiction and referencing the disparities between her trial testimony and her testimony at the preliminary hearing.

---

[1]Robinson's father was employed by the PCSO and Smith's husband was a former task force officer.

## II.  DISCUSSION

### A.      Standard of Review

Because Robinson filed his habeas petition in 2004, the petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  *See Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009). Under the AEDPA, Robinson may obtain relief only if he can demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  We review *de novo* a district court's decision to grant or deny habeas relief and review its factual findings for clear error. *Anthony v. DeWitt*, 295 F.3d 554, 560 (6th Cir. 2002).

### B.      Analysis

Under *Brady v. Maryland*, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment.  373 U.S. at 87.  "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.*  Thus, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) (internal quotation marks omitted).

The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence.  *Id.* at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *Hawkins v. Coyle*, 547 F.3d 540, 556 (6th Cir. 2008). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the

witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

"A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008). Respondent does not dispute that Robinson's claim satisfies the first two prongs of the test. Therefore, the key issue for us to resolve under *Brady* is the third prong—whether Petitioner was prejudiced by the State's actions, i.e., whether the withheld impeachment evidence is "material" to Robinson's jury conviction when viewed in light of the other evidence presented at trial.

Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008) (citing *Strickler*, 527 U.S. at 289-90). As the Supreme Court has further explained:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434. Therefore, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009) (quoting *Kyles*, 514 U.S. at 435).

We conclude that withholding the impeachment evidence regarding Sims was material under *Brady* because there is a reasonable probability that disclosure of the evidence would have resulted in a different outcome for the proceeding.

**1.      The Importance of Sims' Testimony**

There was no physical or testimonial evidence, except Sims', that contradicted Robinson's assertion of self-defense.  The victim was a known drug dealer who was trying to collect a debt from Robinson.  It is undisputed that when Robinson entered Irwin's vehicle, Irwin had his .357 magnum conspicuously displayed.  Robinson testified that Irwin threatened him regarding payment of the $200 debt and that Irwin grabbed for his gun while pulling into the parking lot.  Sims admits that at the critical moment, she was bent down in the front seat trying to pick up her cigarette case, which had fallen on the floor.  The threats by Irwin, coupled with Robinson's testimony that Irwin reached for his gun, make Robinson's self-defense theory plausible; such facts do not constitute a premeditated, deliberate intent to kill Irwin.

Sims, however, told a much different story before the trial court.  During the preliminary hearing, Sims stated that she did not see what happened at the crucial moment and did not know if Irwin reached for his gun.  Yet, at trial Sims testified that Irwin had a pork chop sandwich in his right hand while turning into the parking lot, thus making it unlikely that Irwin reached for the gun as Robinson claimed.  Sims also provided damaging testimony regarding Robinson's demeanor after shooting Irwin.  Initially, Sims stated that Robinson "just stared" at her after shooting Irwin.  At trial, however, Sims testified that Robinson was "smiling" after shooting Irwin, making Robinson seem cold and calculating, and thus undermining his assertion of self-defense.

The Tennessee Court of Criminal Appeals found that "[a]lthough certain details were corroborated by a number of other witnesses, the State's theory was established principally by Kim Sims, the only eyewitness to the crime." *Robinson*, 1999 WL 61062, at *2. Since Sims' testimony was the basis of the State's theory and the only testimony in conflict with Robinson's, impeachment of Sims by the defense was crucial to the outcome of the case and the determination of Robinson's guilt or innocence hinged on the jury's critique of Sims' truthfulness and reliability.  As this Court has observed, "[c]onsiderable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence

when the prosecution's case hinges on the testimony of one witness." *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009).

The State argues that the undisclosed impeachment information would have been merely cumulative because Sims had already been impeached by the jury's attention to the discrepancies between Sims' testimony at the preliminary hearing and her testimony at trial. "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). We are not swayed by the prosecution's argument. Although Robinson attempted to demonstrate that Sims' trial testimony differed from her testimony at the preliminary hearing, the undisclosed information was different in kind because the suppressed materials would have offered insight into why Sims' testimony at trial differed from her testimony at the preliminary hearing. Moreover, Robinson could have used the information to demonstrate that Sims had a pro-prosecution bias at the time of trial. As the Ninth Circuit has noted:

> It makes little sense to argue that because [the defendant] tried to impeach [the key witness] and failed, any further impeachment evidence would be useless. It is more likely that [the defendant] may have failed to impeach [the key witness] because the most damning impeachment evidence in fact was withheld by the government.

*United States v. Serv. Deli Inc.*, 151 F.3d 938, 944 (9th Cir. 1998).

## 2.        Sims' Confidential Informant Status

"The use of informers . . . may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 757 (1952). Indeed, jurors often have a negative predisposition toward informants. "Ordinary decent people are predisposed to dislike, distrust, and frequently despise criminals who 'sell out' and become prosecution witnesses. Jurors suspect their motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and

unreliable . . . ." Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996); *see also Banks v. Dretke*, 540 U.S. 668, 701-02 (2004) (favorably citing Trott, *Words of Warning*, *supra*). Accordingly, since "a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions," the State's suppression of this evidence deprived Robinson of the opportunity to demonstrate Sims' untrustworthiness. *On Lee*, 343 U.S. at 757; *accord Banks*, 540 U.S. at 702. Given juries' negative predisposition regarding informants, the trial jury would likely have been suspicious of Sims and cautious about her testimony. Such suspicion could have very likely redounded to Defendant's benefit.

The suppressed evidence could have also supported the assertion that at the time of trial, Sims was biased in favor of the local authorities. The term "bias" describes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52 (1984). Bias is "not limited to personal animosity against a defendant or pecuniary gain." *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999). Instead, it includes mere "employment or business relationships" with a party and "is always relevant in assessing a witness's credibility." *Id.*

A defendant has the constitutional right to impeach a witness by showing bias. *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974). If a defendant is denied this right, then a new trial must be granted, except if the error was harmless. *United States v. Stavroff*, 149 F.3d 478, 481 (6th Cir. 1998). However, "once a reviewing court applying [the] *Bagley* [materiality analysis] has found constitutional error there is no need for further harmless-error review." *Kyles*, 514 U.S. at 435.

The undisclosed evidence would have been helpful to demonstrate bias by Sims. The State argues that there was no "relationship of mutual profit between Sims and the authorities." Yet, Sims worked for the Sparta Police Department as a CI on at least nine occasions between the time of Irwin's death and Robinson's trial, earning money each time for her cooperation. She also worked as a CI for the PCSO and the TBI, both of

which spearheaded the Robinson/Irwin investigation. As a matter of fact, Sims worked with the PCSO and TBI a mere eighteen days before Robinson's trial began, making a controlled buy from Wade McClure who, like Sims, later served as a witness at Robinson's trial.

The State also argues that although Sims was a CI for the local authorities, she only informed on behalf of the State in unrelated cases and that the special prosecutor and lead TBI investigator in the instant case had no knowledge of her informant activities. We find both arguments unconvincing. First, the facts show that Sims assisted authorities as a CI and, in exchange, was paid for her services. Regardless of whether the cases were unrelated, Sims had a working relationship with law enforcement, including the agencies spearheading the investigation of this case. Robinson was entitled to present such evidence to the jury in order to call into question Sims' credibility and truthfulness. Second, the prosecutor's actual knowledge is irrelevant because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , including the police." *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437) (internal quotation marks omitted). Moreover, regardless of whether the prosecution succeeds in meeting this obligation, its "responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437-38.

## III. CONCLUSION

In summary, the suppressed evidence of Sims' status as a CI is material under *Brady* because Sims was the State's star witness and only her testimony contradicted or undermined Robinson's assertion that he killed Irwin in self-defense. Had Robinson known of Sims' close working relationship with local law enforcement personnel, he could have introduced information regarding Sims' CI status to the jury as evidence of her lack of credibility and the possibility of bias in her testimony.

For the reasons stated above, the district court's order granting Robinson a conditional writ of habeas corpus is **AFFIRMED**.