RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANDREW LEE THOMAS, JR.,

*Petitioner-Appellant,*

*v.*

No. 15-5399

BRUCE WESTBROOKS, Warden,

*Respondent-Appellee.*

---

Appeal from the United States District Court for
the Western District of Tennessee at Memphis.
No. 2:12-cv-02333—Samuel H. Mays, Jr., District Judge.

Argued: November 2, 2016

Decided and Filed: February 24, 2017

Before: MERRITT, SILER, and DONALD, Circuit Judges

---

## COUNSEL

**ARGUED:** Robert L. Hutton, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellant. Michael M. Stahl, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Robert L. Hutton, GLANKLER BROWN, PLLC, Memphis, Tennessee, Kevin Wallace, Elizabeth Cate, Mollie Richardson, WINSTON & STRAWN LLP, New York, New York, for Appellant. Michael M. Stahl, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. Mark A. Fulks, BAKER DONELSON BEARMAN CALDWELL & BERKOWTIZ, P.C., Johnson City, Tennessee, for Amicus Curiae.

MERRITT, J., delivered the opinion of the court in which DONALD, J., joined. SILER, J. (pp. 13–15), delivered a separate dissenting opinion.

———————

## OPINION

———————

MERRITT, Circuit Judge.   In this Tennessee death penalty case, Petitioner Andrew Lee Thomas, Jr., appeals the district court's denial of his petition for habeas corpus under 28 U.S.C. § 2254.[1]   Thomas's primary claim on appeal is that the State violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it suppressed evidence that the key witness against him had been paid $750 by the Federal Bureau of Investigation prior to trial.   We agree that the prosecutor had a duty to disclose this payment rather than allow the witness to commit perjury by denying its existence, and we **REVERSE** and **REMAND** the district court's denial of the writ.

## I.  Background

While our decision today is based upon Thomas's procedural rights as a criminal defendant—as opposed to the substantive charges against him—a brief summary of the underlying facts provides helpful context.   On April 21, 1997, James Day, an armored truck driver in Memphis, was shot as he was moving a bag of cash into his armored truck from a Walgreens store.   The shooter took the bag of cash and left in a getaway car.   Day survived the shooting, but died two years later as a result of complications from his injuries.   Authorities later identified Thomas as the shooter and Anthony Bond, Thomas's friend and co-defendant, as the driver of the getaway car.   For a more complete factual statement, see *Tennessee v. Thomas*, 158 S.W.3d 361, 373-75 (Tenn. 2005).

Thomas was convicted of offenses arising from those facts in both federal and state court.  In a federal trial prior to Day's death, Thomas was convicted of interfering with interstate commerce, carrying a firearm in relation to a crime of violence, and being a felon in possession

—————————————

[1]In a companion case to this one, Thomas also appeals the district court's denial of habeas from his federal conviction arising from similar facts.  One factual difference between the two cases is important:  Angela Jackson's testimony about her receipt of reward money in the federal case does not appear to have been false since the payment in dispute was made after the conclusion of the federal trial.  In a separate opinion also entered today, we affirm the district court's denial of the writ in that case. *Thomas v. United States*, No. 15-6200 (6th Cir. Feb. 24, 2017).

of a firearm. The federal court sentenced him to life in prison.**²** After Day died of complications from his injuries, the State of Tennessee charged Thomas with felony murder. A Tennessee state jury convicted Thomas and sentenced him to death. The Supreme Court of Tennessee affirmed Thomas's conviction and death sentence on direct appeal. *Id.* at 383. Thomas then exhausted his post-conviction remedies under Tennessee law.

Angela Jackson, Thomas's girlfriend at the time of the shooting, was the pivotal witness in both trials. Indeed, Jackson provided the only reliable testimony placing Thomas at the scene of the shooting. Her testimony also provided an important link between Thomas and various pieces of circumstantial evidence in the case. A more detailed account of the evidence presented at trial can be found in the district court's opinion and order.

After the federal trial was concluded but before the state murder prosecution had commenced, the FBI paid Jackson $750 on behalf of the Safe Streets Task Force—a joint federal-state working group charged with investigating and prosecuting gang-related crime. Thomas was never notified of this payment and only discovered it years later during a hearing on his petition for habeas from his federal conviction.

When Tennessee moved to prosecute Thomas for murder, the federal authorities provided the State with relevant evidence and documentation from the federal case. The parties agree that the file contained a receipt documenting the FBI's payment to Jackson and that knowledge of the $750 payment must be "imputed" to the State's prosecutors. Despite the State's concession that its prosecutors had "imputed" knowledge of the payment, they argue they should not be charged with "actual" knowledge. We discuss this argument in Section IV below.

Despite her acknowledged possession of evidence of the payment before trial, the State's prosecutor did not inform Thomas of the payment. The prosecutor's failure to disclose the evidence was particularly egregious in light of the State's repeated emphasis of Jackson's high-minded reasons for testifying—that is, that she was testifying because it was the "right thing to do." This is all made even worse by the fact that the prosecutor failed to correct the record even

---

**²**This court affirmed that conviction and sentence on direct appeal. *United States v. Thomas*, 29 F. App'x 241 (6th Cir. 2002). The companion case to this one denies Thomas's petition for relief from his federal conviction. *Thomas v. United States*, 15-6200 (6th Cir. Feb. 24, 2017).

after Jackson squarely denied receiving any "reward" money in exchange for her testimony against Thomas.

The relevant portion of Jackson's direct examination went as follows:

Q:      When did the FBI agents come to your house?
A:      I don't remember the date, but it was in November of '97
Q:      Did you ask them for your reward money?
A:      No.
Q:      Did you ever get any reward money?
A:      No.

On cross-examination, Ms. Jackson testified:

Q:      You said you were here today to testify because it was the right thing to do.  Is that correct?
A:      Yes.
Q:      And that's your only motivation in testifying today.  Is that right?
A:      Yes, sir.
Q:      You haven't receiving [sic] a reward for any of this?
A:      No.

Finally, on redirect, Jackson testified as follows:

Q:      Have you collected one red cent for this?
A:      No, ma'am, I have not.

After exhausting his post-conviction remedies in state court, Thomas petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2254.  The district court rejected each of his claims and denied the petition in its entirety.  The district court specifically rejected Thomas's *Brady* claim, reasoning that the fact of the payment was not sufficiently "material."

This appeal followed.

## II.  Standard of Review

This court reviews the district court's dismissal of a § 2254 petition de novo, but we must defer to the district court's factual findings unless they are clearly erroneous.  *Jones v. Bagley*, 696 F.3d 475, 482 (6th Cir. 2012).  When the state court is unable or refuses to review a claim presented in a petition brought under § 2254, the highly deferential standard prescribed in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not apply.  *See Henley v.*

*Bell*, 487 F.3d 379, 390 (6th Cir. 2007). Since both parties concede that the Tennessee state courts were unable to review Thomas's *Brady* claim, we review the district court's denial of those claims de novo.

### III. *Brady* Claim

Thomas's first argument on appeal is that the State violated his due process rights as articulated in *Brady v. Maryland* when the prosecution failed to inform him that Jackson had received $750 from the FBI prior to trial. We agree and hold that this claim merits issuance of the writ.

A prosecutor's suppression of evidence violates a criminal defendant's due process rights when the evidence is favorable to the accused and material either to guilt or punishment. *Brady*, 373 U.S. at 87. *Brady*'s rule has been interpreted to require disclosure of all material evidence even if it is only relevant for the purpose of impeaching a government witness at trial. *Bell v. Bell*, 512 F.3d 223, 232 (6th Cir. 2008) (citing *United States v. Bagley*, 473 U.S. 667, 676-77 (1985)).

"A successful *Brady* claim requires a three-part showing: (1) that the evidence in question [is] favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Id.* at 231 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). This court finds prejudice in the *Brady* context whenever the suppressed evidence is "material." *See Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (equating the prejudice prong of *Brady* with materiality). On appeal, the State concedes that it suppressed the evidence in question and that the evidence was favorable to Thomas. Thus, the only issue remaining for decision is whether the evidence of the FBI's payment was sufficiently material to warrant relief under *Brady*.

Evidence is "material" for *Brady* purposes when, in view of all relevant evidence, its absence deprives the defendant of a fair trial, "'understood as a trial resulting in a verdict worthy of confidence.'" *Montgomery v. Bobby*, 654 F.3d 668, 678-79 (6th Cir. 2011) (en banc) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Satisfying that standard requires more than a mere "possibility" but less than proof "by a preponderance that disclosure of the suppressed evidence

would have resulted ultimately in the defendant's acquittal." *Id.* at 679 (quoting *Kyles*, 514 U.S. at 434).

Below, the district court rejected Thomas's argument that the suppressed evidence of Jackson's receipt of $750 from the FBI was material because "there was substantial evidence linking Thomas to the crime, other than Jackson's testimony" and because Jackson's testimony in both the state and federal cases was consistent.  To the extent that these reasons appear to deny relief because there was sufficient evidence to support Thomas's conviction, they mischaracterize the materiality inquiry under *Brady*.  *See id.* (quoting *Kyles*, 514 U.S. at 434) ("*Brady* materiality 'is not a sufficiency of evidence test.'").  The dispositive question, instead, is whether the guilty verdict entered against Thomas is worthy of confidence in the absence of the suppressed evidence.  Under the circumstances, we hold that it is not.

In *Robinson v. Mills*, we addressed materiality in a factually similar case.  In that case, the petitioner, Robinson, had been convicted in state court of first-degree murder after shooting a drug dealer in the back of the head.  *Robinson*, 592 F.3d at 733.  At trial, Robinson sought to mitigate his offense by claiming that he shot the victim in self-defense.  *Id.*  Kim Sims, an eyewitness, testified against Robinson at trial; hers was the only testimony that tended to negate Robinson's claim of self-defense.  *Id.* at 736.  Robinson's attorneys attempted to impeach Sims as a witness by questioning her about her history of drug addiction and significant disparities between her trial testimony and her testimony at a pretrial hearing.  *Id.* at 734.  Despite Robinson's efforts to impeach Sims, the jury convicted him of murder.  *Id.* at 731-32.

Unknown to Robinson, Sims had accepted $70 from the prosecuting jurisdiction's police department in exchange for her cooperation as a confidential informant in an unrelated prosecution against the murder victim's sister.  *Id.* at 734.  Sims had also served as a paid confidential informant for the police department at least seven other times.  *Id.*  Despite the state's recognition that Sims's substantial connection to local law enforcement required appointment of a special prosecutor, the state never informed Robinson of Sims's status as a paid confidential informant.  *Id.*

Reviewing Robinson's petition for habeas, this court held that the prosecution's failure to inform Robinson of Sims's receipt of payment for her services as a confidential informant warranted relief under *Brady*. *Id.* at 738. In reaching that conclusion, the panel held that the evidence was "material" because Sims's status as a paid informant was relevant to demonstrate bias in order to "call into question Sims'[s] credibility and truthfulness." *Id.* We reached that conclusion even though Sims's services to the police were rendered in cases entirely unrelated to Robinson's. *Id.*

Like Sims's testimony in *Robinson*, Jackson's testimony was pivotal to the State's case against Thomas. Jackson provided the only credible identification placing Thomas at the scene of the crime. She provided the only testimony linking Thomas to Bond, his co-defendant, on the day of the shooting. And she provided the only testimony affirmatively attributing Thomas with responsibility for the transactions cited by the State as circumstantial evidence of his involvement in the shooting. Without Jackson's testimony linking Thomas to the events surrounding Day's shooting, the State would have had a very difficult time proving its case. As such, we conclude—contrary to the State's arguments—that Jackson's testimony was vital to the State's case-in-chief against Thomas.

In opposition to this conclusion, the State contends that Richard Fisher's testimony independently placed Thomas in the passenger seat of the getaway car. However, Fisher's testimony lacked credibility. When asked at trial whether he saw the person he observed in the passenger seat in the courtroom, Fisher first identified Anthony Bond—Thomas's co-defendant—despite the State's theory that Bond had been the *driver* of the getaway car. When he was cross-examined by Bond's attorney, Fisher was asked to take a very close look at the two defendants without his glasses. After doing so, Fisher recanted his earlier testimony that Bond had been in the passenger seat and then identified Thomas—the only other defendant—as the passenger in the getaway car. Fisher said he was "very sure" about his second identification, but a reasonable juror would likely have taken that confidence with a grain of salt.

The State further contends that independent, circumstantial evidence tying Thomas to several large expenditures and bank deposits following the shooting would have provided a sufficient basis for confidence in the verdict. This evidence tended to show that Thomas had

accompanied Jackson when she purchased a pink Chevrolet with gold wheels in her own name, that he drove the vehicle off the lot, that the two stayed in a motel the night of the shooting, and that Jackson deposited a large sum of cash into a new account shortly after the shooting. However, none of that evidence overwhelmingly suggests that Thomas was the shooter; at most, it suggests that either Thomas or Jackson came into substantial wealth around the time of the shooting. Without Jackson's testimony linking Thomas to Bond on the day of the shooting, it is much less persuasive evidence of Thomas's guilt. As such, we reject the State's claims that Jackson's testimony was not important to the jury's decision to convict Thomas.

As a criminal defendant, Thomas has the right to impeach the State's witnesses against him on the grounds of pecuniary bias in the case. *Robinson*, 592 F.3d at 737 (citing *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). This right is especially important when, as here, the case "hinge[s] on the jury's critique" of a key witness. *Id.* at 736. Without evidence of the FBI's payment, Thomas had no basis upon which to impeach Jackson on the basis of her possible financial interest in the case. In *Robinson*, this court found that the defendant's right to impeach the government's witnesses had been unduly abridged when he was not informed that the key witness had received $70 in connection with an entirely unrelated case because it prevented him from demonstrating the witness's pecuniary bias against him. *Id.* at 738. The facts here are even worse: The relevant payment was more than ten times larger than the payment at issue in *Robinson*. And, unlike the payment in *Robinson*, it was made in connection with a case against the same defendant involving the exact same facts. If the suppression of evidence of the payment in *Robinson* rendered the verdict against the defendant fundamentally unfair, then suppression of the payment here did as well.

The fact that the payment in *Robinson* was made as part of a confidential informant arrangement does not distinguish this case. While there is no allegation that Jackson formally served as a confidential informant to the FBI and the record does not disclose how the payment in question arose, counsel for the United States in the companion case to this one indicated at oral argument that a payment of this nature is "rare." In justifying its finding of materiality, the *Robinson* panel noted: "Ordinary decent people are predisposed to dislike, distrust, and frequently despise criminals who 'sell out' and become prosecution witnesses. Jurors suspect

their motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable." *Id.* at 737 (citation and internal quotation marks omitted). Jackson falls squarely within this reasoning even if she was not serving specifically as a confidential informant. Jackson clearly committed criminal acts in the aftermath of the shooting—housing a fugitive, lying on a federal firearms purchase form, and disposing of stolen assets, to name just a few. Thus, if the jury had been presented with evidence of an unusual payment to an individual who can be fairly characterized as an accessory after the fact, it might well have chosen to disregard her testimony against Thomas as untrustworthy and unreliable for the reasons discussed in *Robinson*.

The State also argues that the payment was immaterial because any impeachment value would have been duplicative since Jackson had already been extensively cross-examined and her motives for testifying had been undermined as a result. *See id.* at 736 ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." (internal quotation marks omitted) (alteration original)). But this assertion ignores the clear lesson of *Robinson* that impeachment on the basis of pecuniary bias is fundamentally different than impeachment on the basis of character for dishonesty or other bad acts. Indeed, the witness in *Robinson*—like the witness here—had been thoroughly impeached on the basis of inconsistent testimony and past bad acts, but this court nonetheless held that evidence of her financial relationship with the prosecuting jurisdiction was "material" for *Brady* purposes. *Id.* at 736-38 ("Although Robinson attempted to demonstrate that Sims' trial testimony differed from her testimony at the preliminary hearing, the undisclosed information was different in kind because the suppressed materials would have offered insight into why Sims' testimony at trial differed from her testimony at the preliminary hearing."). Since there was no evidence presented at trial that Jackson had a financial interest in the outcome of the case, this evidence cannot be properly considered "cumulative" as that term is used in *Robinson*. In short, the fact that Jackson had been thoroughly impeached on other grounds is no bar to a finding that evidence of her pecuniary bias against Thomas is material under *Brady*.

Because of the importance of Jackson's testimony to the State's case against Thomas and because the jury was not presented with any other evidence of Jackson's pecuniary bias, we find the FBI's $750 payment to Jackson was material to the jury's determination of Thomas's guilt. Accordingly, we reverse the district court's judgment and hold that the State's suppression of the payment violated Thomas's due process rights as articulated in *Brady*.

We pause to emphasize that our ruling today takes root in Thomas's right to a fair trial. We neither review nor dispute the facts articulated by the Supreme Court of Tennessee on direct appeal. In the context of a *Brady* claim, the reviewing court does not ask whether there was sufficient evidence to convict the defendant without the tainted evidence. *See Kyles*, 514 U.S. at 434. Rather, we ask whether the purported *Brady* violation rendered the defendant's trial fundamentally unfair. *See Strickler*, 527 U.S. at 289-90. By focusing on the fairness of the defendant's trial, we protect his constitutional right to present a complete and full-throated defense. As the Supreme Court noted in *Brady*: "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87.

## IV. Prosecutorial Misconduct Claim

In addition to his *Brady* claim, Thomas also claims the State committed prosecutorial misconduct when it knowingly failed to correct Jackson's false testimony about her receipt of reward money.

The Supreme Court has long held that a prosecutor violates a criminal defendant's due process rights when she knowingly allows perjured testimony to be introduced without correction. *See United States v. Agurs*, 427 U.S. 97, 103 (1976). Judged against a less exacting "materiality" standard than standalone *Brady* claims, *see Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009), claims of prosecutorial misconduct require an additional showing that the prosecuting attorney or one of his subordinates actually knew that the testimony was perjured at the time of trial. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (finding misconduct when the prosecuting attorney did not know of the perjury, but one of his subordinates did).

The State's briefing seems confused about the requisite standard of knowledge applicable to claims of prosecutorial misconduct. At times, the State concedes "imputed" knowledge sufficient to support a prosecutorial misconduct claim under *Giglio*. However, at oral argument, the State seemed to say that the doctrine is a legal fiction and strongly denied that any of its prosecutors had *actual* knowledge that Jackson's testimony was perjured.

The latter view finds no support in the Supreme Court's decision in *Giglio*. While *Giglio* never uses the phrase "imputed knowledge," *Black's Law Dictionary* defines it as a "bridge" to facilitate claims "against a principal in which knowledge is a necessary element" on the basis of facts known by the principal's agents. *Doctrine of Imputed Knowledge*, Black's Law Dictionary (10th ed. 2014). Consistent with that definition, the Supreme Court in *Giglio* held that a prosecuting attorney may be charged with the actual knowledge possessed by his subordinates at the time of trial under basic principles of agency law. *See Giglio*, 405 U.S. at 154. The Court did not adopt a recklessness-based, "knew or should have known" standard for knowledge in the context of prosecutorial misconduct claims. *Id.* Absent actual knowledge on the part of someone in the prosecutor's office that a witness had perjured himself, there can be no finding of intentional prosecutorial misconduct under *Giglio*.

The State's unelaborated concession that the prosecuting attorney had "imputed" knowledge might be read either way on the issue of actual knowledge. Were we to reach the merits of the prosecutorial misconduct claim, we might well charge the state prosecutor with actual knowledge that Jackson's testimony about her receipt of reward money was perjured. Given the importance of Jackson's testimony to the State's case and the State's repeated questioning about her purportedly high-minded reasons for testifying, it seems that any competent prosecutor would have carefully reviewed the case file for evidence that Jackson might have been testifying for some less-than-altruistic reason in order to guard against the risk of impeachment. This seems especially true in a case like this one where the witness had already testified against the same defendant in a related federal proceeding. Had the prosecutor done so, the parties agree that she would have come across a document indicating that Jackson had received a significant payment from the FBI after the conclusion of the federal trial. Thus, were we to presume that the State's prosecutor engaged in diligent preparation for trial, we would

conclude that she knew of the payment at trial. However, we need not conclusively decide that issue here because we hold that Thomas is independently entitled to relief based upon his *Brady* claim.

## V. Conclusion

For the foregoing reasons, we hold that Thomas's *Brady* claim in this case entitles him to relief from his Tennessee state court conviction under 28 U.S.C. § 2254.[3] Accordingly, we pretermit our discussion of the remaining issues raised in his petition. The judgment of the district court is **REVERSED** and we **REMAND** the case to the district court with directions to issue the writ of habeas corpus unless the State affords Petitioner a new trial within a period of time to be established.

---

[3]In an opinion also entered today, we deny Thomas's companion petition for habeas relief from his federal conviction and sentence in its entirety. *Thomas v. United States*, No. 15-6200 (6th Cir. Feb. 24, 2017).

---

**DISSENT**

---

SILER, Circuit Judge, dissenting.  I concur with the facts as related by the majority opinion in this case, but I respectfully dissent from the final conclusion that the *Brady* claim entitles the petitioner, Andrew Lee Thomas, Jr., to a writ of habeas corpus for the reasons stated herein.

First, I agree with the parties and with the majority that the *Brady* claim was not decided by the Tennessee state courts, so our review is de novo.  I also agree with the majority that the State conceded that knowledge of the payment of $750.00 to Angela Jackson is imputed to the state prosecutors for purposes of Thomas's claim under *Brady*.  It is not material that the state prosecutor did not find the receipt of $750.00 to Jackson in the file, nor that the state prosecutor was told of that payment.  As the majority indicates, it would seem logical that the state prosecutor would have found something in the case file about the payment, but that is not in our record before this court.  Thomas has benefited from the assumption under law that the successor prosecutor has the imputed knowledge that Jackson was paid the $750.00 and did not admit it later when questioned.  However, I part from the majority at this point.  As the majority states, "a successful *Brady* claim requires a showing . . . that the state's actions resulted in prejudice." *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008)(citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Prejudice results whenever the suppressed evidence is "material." *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010).

As the majority relates, evidence is material for *Brady* purposes when, in view of all relevant evidence, its absence deprives the defendant of a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Montgomery v. Bobby*, 654 F.3d 668, 678-79 (6th Cir. 2011) (en banc) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  The majority opinion depends upon our prior decision in *Robinson*, 592 F.3d at 738.  However, in *Robinson*, the prosecution depended upon an informant, Sims, who had been used by the prosecution in many investigations, whereas, in the present case, Jackson was an important witness, but she was not present at the robbery or the homicide of James Day, the armored truck driver.  She had never

been a paid informant in other cases. Certainly, Jackson's evidence was material, because she related the fact that Thomas came to Jackson's apartment with a large amount of money and that Anthony Bond, the codefendant, was with him and was carrying a gun. She also related the fact that she and Thomas took Thomas's money and bought a car and other items. Thomas also admitted to her that he shot the driver (Day) and that the money was from the robbery.

There is one significant difference in the proof in this case and the proof in *Robinson*. Here, Jackson gave a statement to federal agents long before either trial, describing the events on the day of the crime and her knowledge of Thomas's involvement. Her statements in 1997 are consistent with her testimony at the federal trial in November 1998 and the state trial in 2001. Her statements were given before she ever received any money from the federal agents, because she received the $750.00 after the completion of the first trial in 1997. In *Robinson*, the paid witness had not given earlier consistent statements. She had testified at a preliminary hearing a year before trial, but her testimony at the preliminary hearing differed substantially from the testimony later at the trial.

Moreover, additional evidence introduced at trial placed Thomas at the crime scene. Several witnesses observed Bond and another man get into the car and drive away after the shooting. One of those witnesses, Richard Fisher, testified that he was close to the getaway car as it drove by and he was able to provide in-court identification that Thomas was the passenger in the car. As the majority points out, Fisher originally pointed to Bond as the person in the passenger seat, but as he got closer to Thomas in the courtroom, he identified Thomas as the passenger. The majority is very skeptical about that, but, had the jury believed Fisher's statement that Thomas was the passenger in the car, it could have found Thomas guilty, because the jury decides the credibility of the witnesses.

Other evidence at the trial corroborated Jackson's testimony. For instance, there was evidence about how Jackson and Thomas bought a car with cash soon after the robbery. There was also proof about Jackson's opening a bank account and depositing a large sum of cash in it.

In addition, Jackson was thoroughly impeached during her testimony during trial. She was cross-examined on alleged inconsistent statements to law enforcement and her relationship

with Thomas, including allegations by Thomas that she had been cruel to his son, suggesting a bias by Jackson against Thomas.  She was also questioned about purchasing a gun for Thomas and opening a bank account with proceeds from the robbery.

I agree that under *Brady*, the state was required to reveal to defense counsel the payment of $750.00 to Jackson before the state trial.  However, because that payment was not prejudicial under *Brady*, the writ of habeas corpus should not be granted.  I would affirm the district court in denying the writ.